## TERRITORY v. ANNETTE ISLAND PACKING CO. (FALL, Secretary of the Interior, Intervener.)

(First Division. Juneau. June 13, 1922.)

No. 2023–A.

**Taxation ⟨⇒188—Constitutional Law.**

By section 15 of the Act of Cong. March 3, 1891, c. 561, 26 Stat. 1101 (section 5096a, U. S. Comp. St.) the Annette Island, Alaska, was set apart as a reservation for the use of the Metlakahtla Indians. On the 25th day of January, 1915, the Secretary of the Interior prescribed rules and regulations for the government of the Metlakahtlans and those

⟨⇒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Alaskan Indians who joined them on the reservation under the law. Thereafter the Secretary of the Interior entered into a lease with the Annette Island Packing Company for the establishment of a salmon cannery on the reservation under an agreement with the Indian council. In the year 1919 the packing company prosecuted the business and canned 79,373 cases of salmon, operated seven fish traps, and received a net annual income of $121,500.88. Under general laws assessing on like property throughout the territory the plaintiff, territory of Alaska, levied a tax on the cases of salmon, on the fish traps, and the defendant packing company's income for 1919, and brought this suit to recover the taxes due and delinquent. The Secretary of the Interior intervened and contested the right of the territory to compel payment of its taxes, alleging the packing company and its property are exempt from taxation because located on the reservation under a lease with the United States, as an instrumentality of the government used in Indian affairs. On the agreed statement of facts, *held*, the contract of lease between the Secretary of the Interior and the Annette Island Packing Company, together with its cannery, fish traps, and property used on the reservation under the lease, constitute and are an instrumentality of the United States, used by it in the performance of its duties to its Indian wards, and are not subject to taxation by the territory of Alaska. The attempt of the territory to levy and collect taxes on the said property or the packing company is ultra vires and void. Decree in favor of defendant and intervener and against the territory.

This action involves the right of the territory of Alaska to collect certain occupational license taxes imposed by the territory under the provisions of the act of the territorial Legislature approved May 1, 1919, from the defendant, the Annette Island Packing Company, engaged in canning salmon on Annette Island, an Indian reservation, under authority of a lease from the Secretary of the Interior.

The act of the Legislature (chapter 33, S. L. Alaska 1919, p. 90), is entitled:

"An act to establish a system of taxation, create revenue, and provide for the collection thereof for the territory of Alaska and for other purposes; repealing chapter 52 of the Session Laws of Alaska 1913, chapter 76 of the Session Laws of Alaska 1915, and chapter 74 of the Session Laws of Alaska 1917, and declaring an emergency."

Section 1 of the act, eliminating parts thereof not necessary to this case, reads as follows:

"Sec. 1. That any person, firm or corporation prosecuting, or attempting to prosecute, any of the following lines of business in the territory of Alaska shall apply for and obtain a license, and pay for said license; for the respective lines of business, as follows."

Then follow, under several subdivisions, the lines of business referred to.   The sixth subdivision is:

"Fisheries:

"(a) Clam canneries: Two cents per case;

"(b) Herring canneries: Two cents per case;

"(c) Salmon canneries: Five and one-half cents per case, on kings and reds or sockeyes; three and one-half cents per case on medium reds; and three cents per case on all others.

"In addition to the above tax, salmon canneries shall pay one per cent. of their net annual income.  By 'net' income is meant cash value of the pack of the cannery, less operating expenses, and repairs and betterments actually made.  No deduction shall be made as an operating expense on account of depreciation of machinery, interest on bonds or money borrowed, or other taxes paid.

"(d) Fish traps, fixed or floating: One hundred dollars per annum, so-called dummy traps included.

"(e) Salteries: Ten cents per one hundred pounds on mild cured red king salmon;

"Five cents per one hundred pounds on mild cured white king salmon;

"Ten cents per one hundred pounds on salted codfish;

"Two and one-half cents per one hundred pounds on all other salted and mild cured fish, except herring."

The territory sets up, in its amended complaint, three causes of action; for its first cause of action stating that the defendant, during the year 1919, canned 81,465 cases of salmon, and that under the statute there became due the territory, in license taxes by reason thereof, $2,528.64, no part of which is paid.  For its second cause of action it alleges that defendant, during the said year 1919, maintained and operated seven fish traps, and that thereby there became due, as license taxes, the sum of $700, no part of which has been paid; and for its third cause of action that the net annual income of the defendant during the said year 1919 from its canning business aforesaid was $121,500.88, and that under the statute aforesaid there became due the territory $1,215 as license tax on such income for said year, no part of which has been paid, and prays judgment for said sums and interest from January 15, 1920.

The action is brought under the provision of the statute authorizing the Attorney General, or other authorized legal counsel of the territory, to enforce the provisions of the act, and that any appropriate remedy, either civil or criminal, or both, may be invoked by the territory in the collection of all taxes.

Defendant, answering the allegations of the complaint, in its amended answer, admits the assessment of the tax and that it had not paid any portion of the same, but affirmatively sets forth a lease executed by the Secretary of the Interior, dated April 30, 1918, on behalf of the people of the Annette Island reserve, and that it prosecuted its business of salmon canning on said reserve, which reserve is, and was at all the times mentioned in plaintiff's complaint, a reservation set apart for the benefit of the Metlakahtla Indians and other Indians, being within the purview of the act of Congress of March 3, 1891 (U. S. Comp. St. § 5096a), and the proclamation of the President of the United States of April 28, 1916, creating such reservation, which lease provided, among other things, that, in the event the defendant was not required to pay a territorial license tax upon the output of the cannery, it should pay an amount equal thereto to the lessor, and further that, on March 22, 1920, pursuant to such stipulation, it, the said defendant, had paid the sums mentioned in plaintiff's first and second causes of action to the Secretary of the Interior, for the benefit of the said inhabitants of Annette Island. As to the third cause of action, defendant admits, as before, the levy of the tax, and that it had not paid the same, and affirmatively sets forth the same clause or stipulation in the lease hereinbefore referred to between the Secretary of the Interior and the defendant, and avers that the tax, if valid, would be as claimed by the plaintiff, but further states that it is unable to determine whether the amount thereof is justly due the plaintiff or to the council of Metlakahtla Indians by virtue of the terms of the lease aforesaid, but that it is, and at all times has been, ready and willing to abide by the judgment of the court in that regard.

It appears from the record that the defendant's original answer was in the nature of an interpleader, by which defendant sought to interplead the Secretary of the Interior as party-defendant, and that an order was, on February 5, 1921,

entered to that effect, based upon such answer and the affi-
davit of the then attorney for the defendant; but on March
28, 1921, on motion of the United States attorney, the order
for the interplea was vacated, and Hon. A. B. Fall, as Secre-
tary of the Interior, was granted leave to intervene in the ac-
tion for and on behalf of the people of Annette Island res-
ervation, and file his complaint in intervention. Pursuant to
said last order, the Secretary of the Interior filed his com-
plaint in intervention, by and through the United States at-
torney, alleging, in substance, that he is the Secretary of the
Department of the Interior of the United States; that the
United States of America is the owner in fee of Annette Is-
land and the waters adjacent thereto; that prior to March 3,
1891, said island was occupied by an association of Indians
known as the Metlakahtlans, and that on said date the said
island was set apart as a reservation for the use of said In-
dians and such Alaska Indians as might join them under and
by virtue of section 15 of an act of Congress approved March
3, 1891; that by virtue of said act the said islands and the shore
and tidelands adjacent thereto have been and are reserved for
the exclusive use of the said Metlakahtlans, with sole and ex-
clusive right of fisheries in the waters adjacent thereto; that on
April 30, 1917, Hon. Franklin K. Lane, as Secretary of the In-
terior, on behalf of the people of the Annette Island reserva-
tion aforesaid, and in accordance with an ordinance of the
council of the people of the said island, executed an indenture
of lease with defendant, which lease is attached to the com-
plaint in intervention and made a part thereof; that in said
lease it is provided in and by article 21 that, in the event the
defendant was not required to pay the territorial license tax
upon the output of the cannery so leased, it should pay an
amount equal to the tax to the lessor; said article being in
said complaint in intervention set out in full and made a part
of the statement of facts in this case, hereinafter set forth.
The complaint then sets forth the levy of the tax by the ter-
ritory, the demand for payment, and alleges that the said
tax and the levy thereof are ultra vires.

To this complaint in intervention plaintiff and defendant
both interposed general demurrers to the effect that the same
did not state facts sufficient to constitute a ground for inter-
vention. Argument was had thereon before a former judge

of this court, and the demurrers were overruled, and plaintiff and defendant were required to answer the complaint in intervention. The answer of plaintiff to the complaint in intervention consists of admissions and denials, among others, alleging that Annette Island and waters are subject to the jurisdiction of the territory of Alaska to the same extent and in the same manner as other lands within the limits of the territory are subject to its jurisdiction, and for a further defense alleges certain facts and legal conclusions therefrom, which facts it is unnecessary to repeat in detail, as the same are fully covered by the agreed statement of facts hereinafter set out in full.

Defendant, answering the complaint in intervention, admits all the allegations of the complaint, except that it denies that the plaintiff has attempted to levy a tax on the cannery and property of the defendant, located on the reserve, or the output thereof. It further sets forth the facts of assessment and levy of the tax, and that no part thereof has been paid, and that the defendant has paid the Metlakahtla Indian Council the amount of the tax assessed, for which the territory sues in its causes of action numbered 1 and 2—that is, the license tax on the amount of cases of salmon canned and the license tax for traps—but denies that any demand has been made for income tax as set forth in plaintiff's third cause of action.

The intervener thereafter filed his reply, denying the affirmative matters set forth in plaintiff's answer to the complaint in intervention. It further appears from the record that the original complaint filed contained three causes of action, to which the defendant answered as to the first two causes and demurred to the third cause of action, that the demurrer was sustained as to the third cause of action on October 24, 1921, and that thereupon plaintiff filed his amended complaint. Pursuant to stipulation of date October 24, 1921, the answer of the defendant was allowed to stand as an answer to the amended complaint, and it was further stipulated and ordered that the said amended complaint should in no wise prejudice the complaint in intervention or other orders or proceedings in the case theretofore had. On November 29th an agreed statement of facts in the case were signed and submitted by the respective parties, and on March 23,

1922, the case was submitted on such statement of facts and briefs. The agreed statement of facts is as follows:

"The Annette Islands are a group of small islands in Southeastern Alaska. During the summer of 1887 some 800 to 1,200 Metlakahtla or Tsimpsean Indians emigrated from British Columbia and settled on one of these islands. The emigration and settlement were not only acquiesced in, but encouraged, by executive and administrative officers of the United States, and subsequently were sanctioned by Congress through the enactment of section 15, Act March 3, 1891, c. 561, 26 Stat. 1101 (Comp. Stat. 1916, § 5096a). That section reads as follows: 'That until otherwise provided by law the body of lands known as Annette Islands situated in Alexander Archipelago in Southeastern Alaska, on the north side of Dixon's Entrance, be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla Indians, and those people known as Metlakahtlans who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior.'

"That none of said Indians have ever been naturalized or made citizens of the United States (except that Edward K. Mather, one of said immigrant Tsimpsean Indians, was naturalized in the district court in and for the territory of Alaska, at Sitka, on the 17th day of May, 1898, and Edward Marsden, one of said immigrant Tsimpsean Indians, was naturalized in Marietta, in Washington county, Ohio, in the probate court thereof, on May 1, 1894), and the only act of Congress specially relating to their civil status is that Act of Congress of March 4, 1907 (Public No. 264, 34 Stat. 1411), as follows:

" 'That all Indians of the Tsimpsean or Haida Tribe of the full or mixed blood who emigrated from British Columbia and settled at Metlakahtla on Annette Island in Southeastern Alaska, in the year eighteen hundred and eighty-seven and subsequent years, as well as all descendants of such Indians, and all other Indians who have since become and remained bona fide residents of said Metlakahtla, Alaska, shall, if otherwise qualified, be entitled to receive and obtain licenses as masters, pilots, and engineers, as the case may be, of any and all steamboats and other craft, and also licenses as operators of motorboats and other craft, subject to the provisions of the act of Congress approved May sixteenth, nineteen hundred and six, entitled "An Act to amend section forty-four hundred and twenty-six of the Revised Statutes of the United States, regulation of motorboats," with the same force and effect as if they had been citizens of the United States; any such Indian may be the owner of any such motorboat or other craft, subject to the provisions of the said act of May sixteenth, nineteen hundred and six, although such Indian be not a citizen of the United States, without depriving said motorboat or other craft of the benefits and privileges of a vessel of the United States.

" 'Sec. 2. That a certificate under the hand of any officer of the customs in Alaska, to the effect that the applicant for one of the different licenses mentioned in the foregoing section comes within one of the provisions of said first section of this act, shall, together with the affidavit of the applicant to that effect, be sufficient evidence of the fact that said applicant is entitled to the privileges conferred upon said Indians by the first section of this act.

" 'Sec. 3. That this act shall take effect and be in force from and after its passage.

" 'Approved March 4, 1907, 11 a. m.'

"That the only settlement on the Annette Island reservation is at the town of Matlakahtla; that said town had an Indian population at the census of 1920 of 574 persons; the town was laid out by the said Indian emigrants from British Columbia and native Indians of Alaska who joined them at said town of Metlakahtla in said reservation, and is regularly divided into streets and alleys, blocks, and lots for residence and business purposes; the residences, stores, and other buildings are constructed after the manner and style adopted by the white men in other Alaska towns; that all the residence buildings occupied by Indians at Metlakahtla have always been owned and occupied by individuals or single families and never by clan or community Indian aggregations; the people of the town erected, own, and use a large church building such as might be erected and used in a well-organized American or English community; there are stores and other businesses at the town of Metlakahtla owned by Indian inhabitants of said town of the type usually found in white settlements, and the Indian residents of Metlakahtla have always dressed, in Alaska, like American citizens; that prior to the year 1915 said Indian inhabitants regulated the affairs of said settlement under a form of community or municipal government adopted by themselves; that all the various industries, mills, stores, and cannery in Metlakahtla have paid licenses and other taxes, except poll taxes, prior to 1920, in the same way and for the same purposes as white citizens in other Alaska towns; that in 1920 they were advised by an agent of the United States Bureau of Education not to pay taxes to the territory of Alaska, and many thereupon ceased doing so; that for more than 20 years there has been a sawmill at Metlakahtla which, up to 1917, was owned and operated by individuals resident there, and which manufactured lumber from logs cut within and outside of the reservation; the mill since 1917 has been operated by the people of the town; that for more than 10 years prior to 1917 the salmon cannery at Metlakahtla was operated, for which fish were secured from any waters; during the season of 1919 defendant canned at Metlakahtla cannery approximately 130,000 salmon caught by Indian residents of Metlakahtla outside of the Annette Indian reserve and its reserved waters, and approximately 13,000 caught by other persons outside said reserved area; that the total pack of defendant company at Metlakahtla in the year 1919 was 81,465 cases of salmon.

"That on the 25th day of January, 1915, the Secretary of the Interior prescribed certain rules and regulations for Annette Island reserve, Alaska, for the government of the Metlakahtla Indians and other Alaskan Indians residing there, which said rules and regulations were printed by the Department of the Interior, and a copy is attached to this agreed statement of facts as a part hereof; that no other rules or regulations were ever published or prescribed by the Secretary of the Interior or any one for him for the guidance or control of said Indians prior to the publication of said rules and regulations prescribed January 25, 1915; that at the time of the settlement of said Tsimpsean Indians, emigrants from British Columbia, at said town of Metlakahtla, they were joined by about 50 Tlinket and other Alaska Indians who were natives of Alaska and formed a part of the aboriginal tribes inhabiting Alaska at the time of the transfer thereof from Russia; that there are now approximately 30 Tlinket and 10 other Alaska Indians living at Metlakahtla and forming a part of said town and community, and all the Indians residing on said Annette Island reservation at all times mentioned in this case were Tsimpseans or Metlakahtlans or their descendants and Alaska native Indians or aboriginees of the Tlinket and Alaska tribes; that all schools at Metlakahtla for the education of said Indians are maintained by the United States, and the United States generally exercises supervision over the affairs of said Indians.

"That on the 11th day of February, 1915, the Secretary of the Interior approved the rule and order made by the Commissioner of the Bureau of Education on the 9th day of February, 1915, for the issuance of permits to natives of Metlakahtla to erect·salmon traps on the shores of Annette Island, and for other purposes; that the following is a copy of said rule and regulations:

" 'Department of the Interior,

" 'Bureau of Education.

" 'Washington, February 9, 1915.

" 'Dear Mr. Secretary: Under the provisions of the act of March 3, 1891, setting apart Annette Islands, Alaska, for use in common by the Metlakahtlans, under such rules, regulations, and restrictions as may be prescribed from time to time by the Secretary of the Interior, I respectfully recommend: (1) That, until otherwise ordered by the Secretary of the Interior, natives or associations of natives of Metlakahtla who have secured the approval of the council of the Annette Islands reserve be given permits by the Secretary of the Interior to erect salmon traps on the shores of Annette Island, on condition that they pay to the secretary of the Annette Islands reserve, at the close of each fishing season, a yearly tax of $25 for each trap; (2) that permits be given by the Secretary of the Interior to natives of Metlakahtla to cut timber on the Annette Islands reserve for lumber and piling on condition that they pay to the secretary of the Annette Islands reserve $1.00 per

6 A.R.—38

thousand board feet for all logs sold away from the reserve and fifty cents (50c) per thousand board feet for all logs to be used for lumber or piling on the reserve; and (3) that 10 per cent. of all money paid to the secretary of the Annette Islands reserve for timber and salmon traps shall be used for medical and school work on the reserve under the direction of the commissioner of education. The balance of all funds paid to the secretary of the Annette Islands reserve as fees on timber and salmon traps shall revert to the general fund of the reserve for such uses as the council may direct.

" 'The above recommendations are based upon the inclosed letters from Mr. C. D. Jones, teacher of the United States public school at Metlakahtla, and Mr. W. T. Lopp, chief of the Alaska division of the Bureau of Education, also upon information furnished me by Mr. Lopp.

" 'Cordially yours,          [Signed]   P. P. Claxton, Commissioner.

" 'The Honorable the Secretary of the Interior.

" 'Approved Feb. 11, 1915,

" '[Signed]   Franklin K. Lane, Secretary.'

"That on the 16th day of February, 1916, the Indian council of the Annette Island reserve approved an ordinance requesting the Secretary of the Interior to lease the Metlakahtla cannery for five years to Mr. P. E. Harris, of Seattle, Wash., under the terms proposed in the ordinance, which read as follows:

" 'Ordinance No. 8.

" 'Ordinance to Lease Cannery.

" 'Be it ordained by the council of Annette Islands reserve:

" 'Section I. That the Metlakahtla cannery be leased for a period of five (5) years to P. E. Harris, of Seattle, Wash., or to such responsible person, firm or corporation, as will make the terms of an offer for such lease most advantageous to the people of Annette Islands reserve.

" 'Section II. That such lease shall contain the following provisions:

" '1. That, aside from the management, only Alaska natives shall be employed at the standard rate of wages in fishing for and in the operation of said cannery, and that at no time during the life of this lease shall there be employed for such work any Chinese, Japanese, Filipinos, or Mexicans;

" '2. That all improvements shall become the property of the Annette Islands reserve at the expiration of such lease, and that said reserve shall have an option on the purchase of all machinery installed by the lessee at cost, less depreciation;

" '3. That books containing an accurate record of all receipts and disbursements and all accounts having to do with the business of the cannery in any manner whatsoever shall be kept by the lessee and shall be open at all times to the inspection of the Secretary of the Interior of the United States or to his designated agent, and

shall be fully audited at least once each year by such agent as said Secretary of the Interior may direct; and when so audited a report of the condition of the business shall be made to the council of said Annette Islands reserve;

" '4. That ordinarily the cannery will not be operated at any time between 12 o'clock midnight Saturday and 12 o'clock midnight Sunday, excepting in case of necessity as the amount and condition of the fish on hand shall demand; and

" '5. That no traps above the number already established on Annette Island shall be operated.

" 'Sec. III. The Secretary of the Interior of the United States, or his designated agent, is hereby empowered as agent of this council and for and in behalf of the people of Annette Islands reserve, to make and to enforce the terms of such lease as he deems advisable, subject to the provisions of this ordinance, and to hold the net proceeds accruing subject to further action of said council.

" 'I certify that the above ordinance was regularly passed by the council of Annette Islands reserve at its meeting on February 16, 1916.                    [Signed]   Alfred B. Atkinson, Mayor.
" 'Attest:

" '[Signed]   Edward Marsden, Secretary.'

"That on the 28th day of April, 1916, the President of the United States signed and issued an executive proclamation declaring a reservation the waters within 3,000 feet from the shore at mean low tide of Annette Island, Ham Island, Lewis Island, Spire Island, Hemlock Island, and the adjacent rocks and islets and also the bays of the said Islands, rocks and islets. A copy of said proclamation is as follows:

" 'Annette Island Fishery Reserve, Alaska.

" 'By the President of the United States of America:

" 'A Proclamation.

" 'No. 1332.

" 'Whereas, it is provided by section fifteen of the act of Congress approved March third, eighteen hundred and ninety-one, entitled "An act to repeal timber culture laws, and for other purposes," that "until otherwise provided by law, the body of lands, * * * in Southeastern Alaska, on the north side of Dixon's Entrance, be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla Indians, and those people known as Metlakahtlans who have recently emigrated from British Columbia to Alaska, and such other Alaskan natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary of the Interior"; and

" 'Whereas, the Secretary of the Interior, with a view to assisting the Metlakahtlans to self-support, has decided to place in operation a cannery on Annette Island; and

" 'Whereas, it is therefore necessary that the fishery in the wa-

ters contiguous to the hereinafter described group comprising the Annette Islands be reserved for the purpose of supplying fish and other aquatic products for said cannery:

" 'Now; therefore, I, Woodrow Wilson, President of the United States of America, by virtue of the power in me vested by the laws of the United States; do hereby make known and proclaim that the waters within three thousand feet from the shore lines at mean low tide ,of Annette Island, Ham Island, Walker Island, Lewis Island, Spire Island, Hemlock Island and the adjacent rocks and islets, located within the area segregated by the broken line upon the diagram hereto attached and made a part of this proclamation, also the bays of said islands, rocks and islets, are hereby reserved for the benefit of the Metlakahtlans and such other Alaskan natives as have joined them or may join them in residence on those islands, to be used by them under the general fisheries laws and regulations of the United States as administered by the Secretary of Commerce.

" 'Warning is hereby expressly given to all unauthorized persons not to fish in or use any of the waters herein described or mentioned.

" 'In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

" 'Done at the city of Washington this 28th day of April, in the year of our Lord one thousand· nine hundred and sixteen, and of the independence of the United States the one hundred and fortieth.
                                            " 'Woodrow · Wilson.
" 'By the President:
          " 'Robert Lansing, Secretary of State.'

"That on the 30th day of April, 1917, the Secretary of the Interior entered into a certain indenture of lease with the Annette Island Packing Company, a corporation, defendant herein, by which the Secretary leased to the Annette Island Packing Company, from April 3, 1917, to October 1, 1922, a cannery site and wharf at Metlakahtla and certain fishing rights and other privileges as set out in said lease, a copy of which is attached hereto and made a part of this stipulation.

"That the defendant, the Annette Island Packing Company, is a corporation organized and existing under the laws of ·the state of Washington, having its principal office and place of business in the. city of Seattle, Wash., and is authorized to do business in Alaska.

"That the defendant prosecuted the business of taking and canning salmon in Alaska, at Metlakahtla, on the Annette Island reserve aforesaid, during the year 1919, and during said year, as alleged in plaintiff's complaint herein, canned 2,967 cases of king or red salmon, 2,092 cases of medium reds, and 76,406 cases of other kinds of salmon; and during said year· 1919 the said Annette Island Packing Company maintained, operated, and fished with seven fish traps in the waters of said reserve, and during said

year had and received a net annual income of $121,500.88 from its said business operations in Alaska.

"That, pursuant to law, the territory of Alaska assessed and laid a general license tax for the year 1919 on king and red salmon so canned in the territory. of Alaska in the sum of 5½ cents per case, on medium reds in the sum of 3½ cents per case, and on all other kinds of canned salmon 3 cents per case; for the year 1919 the territory assessed and laid a license tax of $100 upon each fish trap operated in its waters, and for the year 1919 the territory, in addition to the above taxes levied, laid and assessed a tax of 1 per cent. of its net annual income on any person or corporation engaged in canning salmon in Alaska; that all of said licenses and other taxes were so laid, levied, and assessed against the property of and the defendant the Annette Island Packing Company, for the year 1919; that the said company had refused to pay and has not paid the said taxes or any part thereof, because of its alleged lease with the Secretary of the Interior, and this suit was begun by the territory of Alaska to recover same."

The section of the statute of the territory under which the action is brought provides for three distinct series of license taxes to be levied and assessed on the salmon canning business, all of which are in the nature of privilege or occupational taxes. The first is a direct license or privilege tax on the maintenance of fish traps. This tax is fixed at the rate of $100 for each fish trap, and does not depend upon the value of the traps or the amount of salmon caught therein, but is in the nature of a license on the privilege of installing and operating salmon fish traps in and upon the waters within the limits of the territory of Alaska. The second is an occupational tax based upon the gross output of canneries and is dependent upon the number of cases and kind of salmon canned, at the fixed rate therein specified. The third is in the nature of an income tax, based upon the net income of the person or corporation engaged in the business of canning salmon in the territory.

No question has been raised by counsel on either side as to the general authority of the territory to levy these taxes, it being considered that the authority of the case of Alaska Pacific Fisheries v. Territory of Alaska, 236 Fed. 52, 149 C. C. A. 262, is conclusive on this point, but the intervener's position is that the traps and cannery were instrumentalities provided by the United States on the Annette Island reversed for the betterment of the Indian inhabitants thereof, and that, as such, they were exempt from taxation.

The territory, after the admission of the agreed statement of facts hereinbefore set forth, moved court for a judgment on the pleadings and the facts as agreed to by the respective counsel. The argument of counsel for the territory, as elabo-rated in his very learned and extensive brief, filed in support of the motion for judgment, is to the effect that the original Metlakahtla Indians who emigrated from British Columbia and established themselves on Annette Island were British subjects, and not Indians within the meaning of the Constitution of the United States and statutes of the United States, that their descendants, born on said reserve, are citizens of the United States because born within and subject to the ju-risdiction of the United States, citing United States v. Wong Kim Ark, 169 U. S. 649, 18 Sup. Ct. 456, 42 L. Ed. 890, and that those of the Indian or native inhabitants of the territory of Alaska joining the Metlakahtlans on said reserve, were also citizens of the United States, because they had severed their tribal relations and taken up their residence separate and apart from any tribe of Indians and had adopted the habits of civilized life .and, therefore, came within the provisions of the act of February 8, 1887, granting to any Indian in the United States citizenship under those conditions; second, that the Secretary of the Interior was not empowered by the act of March 3, 1891, setting aside the Annette reserve for the use of the Metlakahtla Indians, to make any rules and regulations other than to require those occupying the islands to hold and use the lands thereof in common, and that he therefore had no power or authority to enter into the lease of April 30, 1917, with defendant, or make the special stipulation therein requiring an amount equal to the tax which might be levied by the territory to be paid him for the use of said Indians, and that the said lease was void for that reason and for the further reason that it was not made by the Commissioner of Indian Affairs, who has direct supervision over the affairs of Indians under the general statutes of the United States; third, that the Secretary of the Interior is not a necessary or proper party to the controversy between plaintiff and defendant, and that the complaint in intervention does not show that the intervener is entitled to any relief in the premises, and therefore that the demurrer to the complaint in intervention should have been sustained; fourth, that the defendant is a corpora-

tion organized under the laws of the state of Washington engaged in the salmon packing business in Alaska, and is not such an instrumentality of the United States as would exempt it from the payment of license taxes imposed by the act of the Legislature of 1919 aforesaid; fifth, that no pleading or proof is offered by the intervener to deny the legality of the license tax on income of defendant, set forth in the third cause of action of the plaintiff; sixth, that the taxing power of the Legislature of the territory is absolute and without limitations other than those imposed by the Constitution, laws of the United States, treaties of the United States, and organic act of the territory, and that these do not limit the power of the Legislature to impose license taxes upon defendant while on an Indian or other reservation in the territory, but that, on the contrary, section 3 of the organic act expressly grants that power to the Legislature.

These positions are controverted by the United States attorney in his elaborate brief.

James Wickersham, of Juneau, for plaintiff.

John B. Marshall, of Juneau, for defendant.

Arthur G. Shoup, U. S. Atty., of Ketchikan, for intervener.

REED, District Judge. In the brief of counsel for the territory many subordinate questions have been presented which are incidental to, and intertwined within, the main issues of the case, a discussion of which is involved in such main issues, and I do not deem it necessary to notice all these subsidiary questions so raised, because a discussion of the main issue in the case, to a large extent, will necessarily determine such subsidiary questions. One of these questions which are raised by counsel is that the present Metlakahtla Indians, who are now almost wholly descendants of the original emigrants from British Columbia, are, by virtue of the first paragraph of the Fourteenth Amendment to the Constitution of the United States, citizens, and that those of the aboriginal inhabitants of the territory who took up their residence with the Metlakahtla Indians on such reserve are also citizens by virtue of the provisions of section 6 of the act of February 8, 1887 (U. S. Comp. St. § 3951), and that therefore, as citizens, they are subject to the laws of the territory

and liable to taxation under the general tax laws of the territory.

Whatever may be the force of the argument of counsel as to the political status of these Indians, I do not deem the question of their citizenship material in this case. Assuming that they are citizens of the United States and have adopted the habits of the whites, yet they are residing upon a reservation set apart for their use in common, under the act of March 3, 1891. It may be conceded that they have adopted the habits of the whites, own their own homes and churches, and have attained a fairly intelligent view of the requirements of civilized society; also that for more than three decades prior to the year 1914, the government of the United States accorded them no special privileges or assistance; and that these people were exclusively under the guardianship, care, and tutelage of the noted missionary who had, for more than half a century, been their preceptor and spiritual guide. Suffice it to say on this point that the Secretary of the Interior had for several years prior to the year 1919, when the taxes subject of this action were levied, assumed the rôle of guardian of the interests of these people, under authority given him by Congress in the aforesaid act, and this guardianship was accepted and concurred in by the people themselves. This fact is evident not only by the correspondence, but by the promulgation of rules and regulations by the Secretary for the government of the Indians and their acceptance thereof; the allowance of certain privileges as to timber and trap sites for fishing; the order in council of 1915 requesting the Secretary of the Interior to lease the cannery held in common by them; the proclamation of the President of April 28, 1916, wherein it is said by the Chief Executive of the nation that the "Secretary of the Interior," with the view of assisting the Metlakahtlans to self-support, had decided to place in operation a cannery on Annette Island," the schools afforded by the government, and other activities upon the behalf of these native Metlakahtlans. The authorities are unanimous that during the period when the relation of guardian and ward exist between the United States and any one of the Indian race, even though he be a citizen of the United States, it is the right and duty of the United States to protect and preserve the Indian's rights through the courts. See Eells v. Ross, 64 Fed. 417, 12

C. C. A. 205; United States v. Boylan (D. C.) 256 Fed. 487; United States v. Nice, 241 U. S. 591, 36 Sup. Ct. 696, 60 L. Ed. 1192; United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532.

If, therefore, the relation of guardian and ward existed between the United States and the Metlakahtlans when the territorial tax sued for in this case became due, the question of the citizenship of those people, whether by virtue of the Fourteenth Amendment, under the authority of the case of the United States v. Wong Kim Ark, 169 U. S. 649, 18 Sup. Ct. 456, 42 L. Ed. 890, or by virtue of the congressional act of February 8, 1887, would not be material, for, whether they are citizens of the United States or not, if the defendant was an instrumentality of the Executive Department of the government to assist those people, they being wards of the government, to become self-supporting in accordance with the time-honored policy of the United States, and the tax was imposed on that instrumentality, it would be void.

While it may be true, as urged by counsel for the Territory that the Metlakahtlans residing on the reserve are not a tribe of Indians in the sense used in the Constitution of the United States, yet they are, and always have been, recognized as members of the Indian race, and the dealings of the government with them have been as if they were a dependent people. Early in the year 1886 an application was made to the Interior Department for a permit for those of the tribe desiring to move from Canada to the United States to settle on the public lands as a community, which request was referred to the Attorney General for an opinion, and on February 28, 1887, the Attorney General rendered an opinion as to their status with reference to the public lands of the United States. The Attorney General, in his opinion reported in 18 Op. of Attys. Gen. 557, addressing the Secretary of the Interior, says:

"Sir: Your letter of the 24th instant, with the accompanying inclosures, presents for consideration the statement that a body of about one thousand Indians, who are natives of and residents within the limits of British Columbia, about 20 miles from the line of Alaska, who have attained an advanced state of civilization, are self-supporting, and are organized into a community governed by a council, wish to emigrate into Alaska. You inquire, 'Whether the Indians as above described can go into Alaska as emigrants and then secure such rights as are accorded to the residents of

that territory who are not Indians; and as they wish to go as a, colony, whether, under existing laws, it would be competent for the President to set aside as a reservation for such colony such reasonable portion of unoccupied land in that territory as they may select for their location.'

"Immigration of peaceful individual Indians who have dissolved tribal relations is not prohibited by statute and is not inconsistent with the general policy of our government, but a band of Indians born within the United States, who maintain their tribal relations, is regarded by the law substantially as an independent domestic nation under the guardianship of the United States. If such tribe be born and reside outside of the United States, and still maintains the tribal or national character, it cannot be entitled to emigrate and locate on public lands of the government; for the very fact of a national existence implies possession of a place of habitation, laws, customs, or traditions of government, with some or all of the attributes of a body politic. Such a people thus organized, locating upon a body of public lands, would exclude such occupancy and enjoyment as is contemplated by our land laws by such persons as are entitled to purchase and appropriate, or subject them to usages, customs and traditions inconsistent with the general laws. The permanent guardianship or supervision of such a domestic dependent nation cannot be assumed by the executive department of the government without the authority of positive laws, except as to those Indians who are born within the United States. If the Indians referred to in yours should as distributed individual Indians immigrate, the rights of such individual Indians would not in any respect rise higher than those of any other foreigner, · and they would be much less than foreign white emigrants, because the provision of law for naturalization would not apply to them. The provisions of the homestead law, by the fifteenth section of the act of the 3d of March, 1875·(18 Stat. 420), which extended the benefits of the homestead law to Indians who have abandoned the tribal relation properly qualified, is limited in its operations to Indians 'born in the United States.' The proviso to the eighth section of the act of the 17th of May, 1884 (23 Stat. 26), only reserves in Alaska the rights of Indians and other persons than in possession or claiming lands therein. There seems to be no provision of law assuring ·to such foreign Indians any legal right to acquire lands. The general land laws of the United States, except the mining laws, have not been extended to Alaska. The President, then, cannot by virtue of any necessity arising in the administration of those laws set aside a reservation. His power to declare permanent reservation for Indians to the exclusion of others on the public domain does not extend to Indians not born or resident in the United States. The case you submit does not come within the scope of any power granted to the executive; but while the present policy of the government and tendency of legislation is to aid and encourage the Indian tribes to advance in civilization and enlightenment, so

that at no distant period they may be qualified to become a part of the homogeneous mass of the American people, skilled and educated in the arts of peace, with all the rights and privileges of citizenship, if the case submitted be one properly the subject of relief, that relief must be sought at the hands of Congress."

Encouraged by the implied assent of the officers of the government, these people, however, did emigrate from British Columbia, and, under the guidance of their material and spiritual instructor, the missionary, William A. Duncan, settled on Annette Island and there erected their homes and continued their system of local government by a communal council. This emigration took place in the year 1886. It appears that for several years thereafter Congress made appropriations from the public treasury for the maintenance of schools for these people on the island. After settlement thereon, some few of the native Indians of Alaska joined the community, and finally, on March 3, 1891, Congress passed the act setting aside Annette Island reserve for their use in common. Thereafter for over 20 years these Indians continued to reside exclusively on the reservation thus created for their occupation without special supervision on the part of the Interior Department of the United States, except that the occupation of any part of the reservation was forbidden to any other than those of the Indian race choosing to submit to the government of the community. During this period, however, their welfare was not lost sight of, for Congress, in 1907, passed an act authorizing these people to own vessels and to become masters of vessels, if otherwise qualified, although they may not have been citizens of the United States. Evidently the Department officers recognized the superior degree of intelligence and civilization of these people and the remarkable results of the labors of the noted missionary for their welfare, and was content that they should continue under his supervision and guidance. But during the year 1915 a more active interest was taken in their welfare by the Department of the Interior. Rules and regulations were promulgated by the Secretary for their control and providing for their government along the lines generally of their old council government. Schools were established under government supervision. A further provision was made for their welfare by reserving to them the rights of fisheries in the waters adjacent

to the reserve, and other activities in their behalf were instituted by the Interior Department, clearly indicating that the position of the executive was that these people were a dependent people, under the guardianship of the United States. These people, residing on a reservation established on their behalf by Congress, which they were authorized to use in common, subject to such restrictions and regulations as the Secretary of the Interior might make, took, in my view, a status politically analogous to that of native Indians on reservations within the United States, and hence became wards of the government. This view of the status of these people is borne out by the Supreme Court in Alaska-Pacific Fisheries v. United States, reported in 248 U. S. 78, 39 Sup. Ct. 40, 63 L. Ed. 138. Therein the court, through Mr. Justice Van Devanter, said:

"The reservation was not in the nature of a private grant, but simply a setting apart, 'until otherwise provided by law,' of a designated public property for a recognized public purpose—that of safeguarding and advancing a dependent Indian people dwelling within the United States. * * * The purpose of creating the reservation was to encourage, assist and protect the Indians in their effort to train themselves to habits of industry, become self-sustaining and advance to the ways of civilized life. True, the Metlakahtlans were foreign born, but the action of Congress has made that immaterial here."

Counsel for the territory strenuously argues that, according to section 15 of the act of March 3, 1891, establishing the Annette Island reserve, the power of the Secretary of the Interior "to make rules and regulations" is limited to the duty of requiring the two classes of Indians therein mentioned to occupy the lands in common, or, as stated by counsel, his power is limited to the making of rules and regulations and restrictions for the single purpose of requiring them, the Annette Islanders, to respect each other's rights, that they may hold and use the lands in common.

The section referred to provides:

"That until otherwise provided by law the body of lands known as Annette Islands * * * be, and the same is hereby, set apart as a reservation for the use of the Metlakahtla Indians, * * * and such other Alaska natives as may join them, to be held and used by them in common, under such rules and regulations, and subject to such restrictions, as may [be] prescribed from time to time by the Secretary."

I cannot see the force of the contention of counsel for the territory. The clause "under such rules and regulations, and subject to such restrictions," etc., refers to the holding and use of the land, and, though the holding and use must be in common, yet the Secretary may prescribe rules and regulations under which the land may be held and used. The rules and regulations on the holding and use of the land may be issued by the Secretary from time to time, as the exigencies may require. This is a continuing power vested in the Secretary of the Interior and discretion as to when and what rules and regulations and restrictions on the use and occupancy of the land should be issued.

This seems to be the only fair construction of the law, and is the interpretation placed thereon by the Secretary of the Interior, charged with the duty of prescribing such rules and regulations and restrictions, as well as by the President of the United States, as shown by his proclamation setting apart the reservation of the fisheries adjacent to Annette Island. Even were the construction of the section doubtful, great weight should be given to the construction which is placed thereon by the department charged with its execution. This is the rule laid down by the Supreme Court in the case of the United States v. Cerecedo Hermanos y Compania, 209 U. S. 339, 28 Sup. Ct. 533, 52 L. Ed. 821, wherein the Supreme Court said:

"We have said that when the meaning of a statute is doubtful great weight should be given to the construction placed upon it by the department charged with its execution"—citing Robertson v. Downing, 127 U. S. 607, 8 Sup. Ct. 1328, 32 L. Ed. 269; U. S. v. Healy, 160 U. S. 136, 16 Sup. Ct. 247, 40 L. Ed. 369.

See, also, National Lead Co. v. U. S., 252 U. S. 140–145, 40 Sup. Ct. 237, 64 L. Ed. 496.

In Jacobs v. Prichard, 223 U. S. 214, 32 Sup. Ct. 292, 56 L. Ed. 405 the court uses the following peculiarly apt language:

"The rule which gives strength to the construction of the officers who are directed to execute the law and who, it has been said, may have written or suggested it, is given an added force from one of the provisions of the act of Congress. It directs the Secretary of the Interior 'to make the necessary regulations to carry out the purposes,'" of the act.

How would the narrow construction of the statute maintained by the territory comport with the purpose of Congress in creating the Annette reserve, as announced by the Supreme Court of the United States in the Alaska-Pacific Fisheries Case, which says that such reservation was made "to encourage, assist and protect the Indians in their effort to train themselves to habits of industry," etc.? If such a construction were proper, the Indians would be left without any assistance except that which might be afforded by the private individuals. Their protection would be confined to preventing others from encroaching on the reservation. Their sole regulation or restriction to the holding and use of the land would be that the same be held in common, without the one trespassing upon the right in common of the other. They would be left without any guidance in reference to their material welfare. Such a construction of the statute was not within the intent of Congress and leads to the absurd conclusion that the Indians would have to work out their own destiny without the encouragement, assistance, and protection which has been for more than a century the policy of the government toward its wards, and which the Supreme Court says was the purpose of Congress in making the reservation.

It is a cardinal rule of statutory construction that a statute. should receive a sensible construction so as to effectuate the legislative intent. In the case of Oates v. National Bank, 100 U. S. 244, 25 L. Ed. 580, the Supreme Court, speaking with reference to the construction of the statute, said:

"We should discard any construction that would lead to absurd consequences."

And in the case of Lau Ow Bew v. U. S., 144 U. S. 59, 12 Sup. Ct. 520, 36 L. Ed. 340, the principle is concisely stated in these words:

"Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion."

In the case of United States v. Linn, 15 Pet. 316, 10 L. Ed. 742, it was said by the Supreme Court:

"It is the duty of all public officers intrusted with the execution of powers delegated to them, to pursue the directions of the

law conferring the power. But to construe all such laws as a special delegation of authority, to be strictly and literally pursued, and to consider every departure from it as done without authority and absolutely void, would frequently be defeating the very object and purpose for which the law is made, and ought not to receive such a construction, unless the statute itself declares all such acts void."

Applying this principle to the decisions of both our appellate court and the Supreme Court, declaring the purpose of the act of Congress of March 3, 1891, was to assist the Annette Islanders to become self-supporting, the proper construction of the power of regulation and restriction delegated the Secretary of the Interior would be to so construe the statute as to enable him to carry out the purpose of the act as found by the courts. The Secretary of the Interior is charged with the duty of making rules and regulations and imposing restrictions upon the holding and use of the lands reserved, and his construction of the statute correctly is that he may make any rules and regulations governing the condition of the affairs of the residents of the reserve which may tend to their welfare as a dependent people, in their efforts to adopt the habits of civilized life. It is therefore, in my opinion, clear that these Indians are wards of the government, and, further, that the Secretary of the Interior, by virtue of the statute of March 3, 1891, as well as by virtue of his general supervisory power over the Indian people who are wards of the nation, is authorized to enact and promulgate such rules and regulations and restrictions as may promote their welfare.

The Metlakahtlans and associate Indians, being wards of the nation, as was said by the Supreme Court in the Alaska-Pacific Fisheries Case, the question of their being foreign born is immaterial here. If such Indians leave the reservation and take up the habits of civilized life, they may become citizens of the United States under the act of February 8, 1887, but that is a question to be determined in each individual case. It must be conceded, as before stated, that the question of the citizenship of these people is not a material question in this case, provided they occupy the status of wards of the nation. This has been held too many times in federal and state courts, even in cases where citizenship had been conferred on Indian allottees, to be gainsaid. See U. S. v. Rickert, 188 U. S. 432,

23 Sup. Ct. 478, 47 L. Ed. 532; McKnight et al. v. U. S., 130 Fed. 659, 65 C. C. A. 37; Farrell v. U. S., 110 Fed. 942, 49 C. C. A. 183; Eells v. Ross, 64 Fed. 417, 12 C. C. A. 205; U. S. v. Pearson (D. C.) 231 Fed. 279.

In the case of Winton v. Amos, 255 U. S. 391, 392, 41 Sup. Ct. 342, 349 (65 L. Ed. 684), the court said:

"It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property. The guardianship arises from their condition of tutelage or dependency; and it rests with Congress to determine when the relationship shall cease; the mere grant of rights of citizenship not being sufficient to terminate it"—citing Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299; Tiger v. Western Investment Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738.

The proposition that the Indians residing on Annette Island are wards of the government and the further proposition that the Secretary of the Interior, in addition to his general supervisory power over Indians as wards of the government, is, by the act of Congress creating the reservation, endowed with special statutory powers of regulation and restriction concerning the government and use of the land reserved for the Indians during their occupation thereof, being demonstrated, we must then turn to the further contention of the territory that the Secretary was not empowered or had no authority to execute the lease to the Annette Island Packing Company referred to in the agreed statement of facts.

It appears that the native council of Metlakahtla Indians on February 16, 1916, passed an ordinance (No. 8), entitled "An ordinance to lease cannery." In this ordinance it was provided for the lease of the Metlakahtla cannery to one P. E. Harris or other responsible parties, under certain restrictions, and also provided for the lease of certain trap sites. Section 3 of the ordinance authorized and empowered the Secretary of the Interior, as agent of the council, for and on behalf of the people of Annette Island, to make and enforce the terms of the lease, subject to the provision of the ordinance, and to hold the net proceeds accruing subject to further action of the council. It appears from the statement of facts that the Metlakahtlans had erected and were maintaining a salmon cannery on the reserve, and the purpose of the ordinance was to empower and authorize the Secretary to lease the cannery

for their use and benefit.  It further appears from the brief of counsel that the cannery so authorized to be leased was burned in the summer of 1916, before the lease authorized by the ordinance was consummated.  However, proceeding as of the authority granted by the ordinance of February 16, 1916, the Secretary of the Interior, on April 30, 1917, entered into a lease on behalf of the people of Annette Island, with the Annette Island Packing Company, thereby leasing the cannery site and fish trap rights on the reserve for the term of six years, including the right to use the cannery building and buildings appurtenant, wharf and water rights appurtenant, and the fishing rights around the island.  The lease is attached to the agreed statement of facts and contains many provisions advantageous to the islanders, some of which it would be well to notice.  The lessee therein agreed to erect the necessary cannery, warehouse, and other buildings for the operation of a cannery, together with a wharf or dock, and to keep the same in repair, to advance the money necessary to install in said buildings all suitable machinery for not less than a complete two-line cannery, and to keep the same at all times in repair for the best service, and to operate the cannery during the lifetime of the lease.  It is stipulated that the lessee should have exclusive rights of fishing around the island and to have the use of the water system at Metlakahtla and other privileges, but that such exclusive right is not to interfere with the rights of the Indian or native inhabitants thereof.'  It is further stipulated that the lessee would co-operate with the Indian inhabitants of the reservation in their co-operative store;  would employ Indian labor so far as possible in all branches of the cannery;  would buy shooks for boxes from lumber manufactured by the Indians;  would pay certain sums of money set out in said lease, etc.  It was further provided, in article 13 of the lease, that the lessee should equip the cannery with a modern machine shop and permit free use of the same by the government in connection with the training school for Indians during the time that the cannery was in operation.  It was further provided that, at the expiration of the lease period, as therein provided, the Secretary of the Interior, the Indian council of Annette Island reserve, or any individual or corporation, being inhabitant of said reserve, might take over the property then owned by

6 A.R.—39

the lessee, consisting of canning machinery and equipment, funds for which had been advanced by the lessee, at the original cost of said property, as shown by the records, less depreciation to be determined by arbitration. Article 21 of said lease provided as follows:

"It is further agreed that in the event the party of the second part is not required to pay federal or territorial license or a tax on the output of the cannery, then it shall pay the party of the first part, in addition to the amount at the rate of one cent per fish an amount equal to what the license or tax on such output would be if the same were collected."

It appears that all the terms of that lease have been complied with on the part of the lessee. They have erected a cannery building and engaged in the business of canning salmon at Metlakahtla, as provided therein, and have in all respects, so far as appears from the record, complied with all the conditions and terms of the lease.

Counsel for the territory contends that there is no authority vested in the Secretary to execute such lease, and that the same is ultra vires and void. To this end it is argued that the council had no existence in law and could confer no authority on the Secretary except as citizens might confer authority on an agent to act for them, and further that the council had no authority to lease any portion of the reserve or authorize the Secretary to make the lease, and that the Secretary, as an officer of the government, had no such authority. Conceding only for the purpose of statement that the contention of the territory is valid, is it in a position to complain of this lease? In my opinion it is not. The only person that could raise the question of authority of the islanders to make the lease or to authorize the making of it is the government having jurisdiction over the reserve or a party whose interests are directly affected thereby. It is a general rule that strangers cannot question ultra vires acts of a corporation, and it seems to me that this rule will apply with great force in the present case as to contentions of counsel. In the case of Benson v. United States, 146 U. S. 325, 331, 13 Sup. Ct. 60, 62 (36 L. Ed. 991), a case arising over the question of the jurisdiction of the United States over a portion of the Ft. Leavenworth military reserve which was not actually used for military purposes, the Supreme Court said:

"In matters of that kind the courts follow the action of the political department of the government. The entire tract had been legally reserved for military purposes. * * * The character and purposes of its occupation having been officially and legally established by that branch of the government which has control over such matters, it is not open to the courts, on a question of jurisdiction, to inquire what may be the actual uses to which any portion of the reserve is temporarily put."

In this case the territory seeks to challenge the authority of the Secretary of the Interior to lease a portion of the reserve. Congress having made the Annette Island reserve for the purpose of assisting a dependent people to become self-supporting it would not be open to the territory to question the use of any portion of the reserve by the political department of the government in furtherance of the intention of Congress. The reasoning of counsel is not sound, if our premise is correct, as to the authority of the Secretary of the Interior to make rules and regulations for the government of these people in the occupation of the island. The Secretary of the Interior, on January 28, 1915, promulgated, under such authority, certain rules and regulations governing the use and occupancy of the Annette Island reserve by the inhabitants thereof, and therein provided that the government of the reserve should be vested in an elective council of 12 members, inhabitants of the island, and also prescribed their powers and duties. The method of choosing this council was therein prescribed by the Secretary of the Interior, and the council was to govern the Indians in general accordance with old-established usages in that regard.

Now, it is a canon of interpretation that regulations of a department, authorized by an act of Congress, in the execution of the act, and not inconsistent with it, have the force of law. See Blanset v. Gardin (C. C. A.) 261 Fed. 312, and authorities cited. The council of Annette Island, established in pursuance of the regulations of the Secretary of the Interior, authorized by Congress to make such regulations, is therefore a lawfully established body, and is, under such regulations, with the assent of the Secretary of the Interior, authorized to grant permits or lease lands reserved for their use, for the common good of the inhabitants. It is so provided in the regulations.

The instant case is distinguishable from the case of Mc-Curdy v. U. S., 246 U. S. 263, 38 Sup. Ct. 289, 62 L. Ed. 706, cited by counsel in support of his position. In that case the question arose on the authority of the state to tax property purchased with funds released from the control of the government. The court, in that case, on page 272 of 246 U. S., on page 292 of 38 Sup. Ct. (62 L. Ed. 706), say:

"It is consistent with the facts shown that the restriction upon alienation inserted in the deed was not a continuation of control reserved by the Secretary of the Interior, but a bringing under his control of a part of Panther's estate theretofore freed. * * * While an Indian is still a ward of the nation, there is power in Congress even to reimpose restrictions on property already freed; * * * but Congress did not confer upon the Secretary of the Interior authority to exercise such power under the circumstances of this case or to give to property purchased with released funds immunity from state taxation."

In the case at bar the authority of the Secretary to make the rules and regulations came directly from Congress. His authority to make the lease of the cannery as agent of the native Indians of the reserve was given under an ordinance of the council, and the manner of the execution of the authority so granted cannot be questioned except between the parties themselves. The executive officers of the government in dealing with governmental activities, are often compelled to do acts in carrying out the policy of the law, not directly authorized, but such acts, when within the scope of the general legislative authority granted, have always been held as part of the necessary adjuncts of departmental authority, and a necessity in the practical operation of government activities. Such acts, when within the general scope of the legislative authority granted, are always upheld. In the instant case the lease, containing, as it does, so many covenants advantageous to the wards of the government, is one of those cases where every intendment should be given toward upholding the authority for its execution. As was said by Justice Van Devanter in the case of the Alaska-Pacific Fisheries Case:

"The general rule [is] that statutes passed for the benefit of dependent Indian tribes or communities are to be favorably construed; doubtful expressions being resolved in favor of the Indians."

Herein authority was given to native residents of the reserve to hold and use, in common, the lands and fisheries within the limits of the reserve, subject to regulations and restrictions promulgated from time to time by the Secretary of the Interior.  The power given to the Secretary to regulate and restrict the use of the land was a continuing power.

In the celebrated case of United States v. Macdaniel, 7 Pet. 1, 8 L. Ed. 587, the Supreme Court laid down this doctrine:

"A practical knowledge of the action of any one of the great departments of the government must convince every person that the head of a department, in the distribution of its duties and responsibilities, is often compelled to exercise his discretion.  He is limited in the exercise of his powers by the law; but it does not follow that he must show statutory provision for everything he does.  No government could be administered on such principles."

In Bates & Guild Co. v. Payne, 194 U. S. 106, 24 Sup. Ct. 595, 48 L. Ed. 894, it was said:

"Where the decision of questions of fact is committed by Congress to the judgment and discretion of the head of a department, his decision thereon is conclusive; and * * * even upon mixed questions of law and fact, or of law alone, his action will carry with it a strong presumption of its correctness, and the courts will not ordinarily review it, although they may have the power."

In this case the question whether the lease is for the welfare of the natives is a question of fact, and the decision of the Secretary is conclusive thereon.  The question of law involved is whether the Secretary, under his power of regulation and restriction of the use of the land and fisheries of the reserve, could, for the benefit of the Indians, as wards of the government and in pursuance of the intent of Congress, make the lease.  The construction placed on the statute by the department head is that he had power and so exercised it, and that construction carries with it a strong presumption of its correctness and will not ordinarily be reviewed by the courts.  There can be no doubt that power was vested in the inhabitants of the reserve to use the lands in common, subject only to such regulations and restrictions as the Secretary should, from time to time, make.  If no restrictions were made contra, they might, through the representative council, erect canneries and fish traps on the island for their own common welfare, or give authority to one of their number to erect and

maintain the same for their common good. I can see no distinction between this power and the power of leasing the rights and privileges to one not a member of the community, where the lease is made for the welfare of the community in common and when such lease is assented to by the executive department.of the government having the right to object thereto. It is using the land and fishing rights reserved for the common good and in pursuance of the general policy of the government for the upbuilding and rendering self-supporting a dependent people.

Judge Morrow, in the case of Alaska-Pacific Fisheries v. United States, 240 Fed. 281, 153 C. C. A. 200, in reviewing the authority of the President to reserve the rights of fishery adjacent to Annette Island for the benefit of the residents thereof, in a most thorough and convincing opinion upholds that authority, and also, in my opinion, disposes of the contention of the territory as to the power of the Secretary of the Interior to make rules and regulations and enter into the lease in question for the benefit of the inhabitants of Annette Island. After quoting from the case of United States v. Midwest Oil Co., 236 U. S. 459, 35 Sup. Ct. 309, 59 L. Ed. 673, wherein the Supreme Court say:

"It may be argued that, while these facts and rulings prove a usage, they do not establish its validity. But government is a practical affair intended for practical men."

Judge Morrow, for the Circuit Court, says:

"In the present case there is no question about the President's reservation of Annette Island being in conflict with the preceding act of Congress. It is not; but, on the contrary, the reservation is in conformity with the purpose of the act and was designed to carry that purpose into practical effect. Section 15 of the act of March 3, 1891, reserved that island for the use of the Metlakahtla Indians and such other Alaskan natives as might join them. What use? These Indians are not agriculturists, and, if they were, the island is practically worthless for that purpose, since the island has very little agricultural land upon it. These Indians are fishermen and hunters and they obtain their living by fishing and hunting, mainly by fishing in waters such as surround Annette Island. The island was then reserved for the habitation of these Indians and for their use in obtaining their food supply from the waters immediately surrounding the island. Now if, as the Supreme Court says in the Midwest Oil Case, the 'government is a practical affair intended for practical men,' we can think of noth-

ing more practical, under all the circumstances, than the reservation by the President of the waters immediately surrounding Annette Island for the use and benefit of these Indians; and this was undoubtedly the practical purpose Congress had in view when it made the original reservation."

Thus our appellate court holds that the reservation made by the President was the putting in practical operation of the purpose of Congress in enacting the act making the reservation. It will be noted that the President, in his proclamation, assigns as a reason therefor that the Secretary of the Interior had decided to install a cannery on Annette Island, with a view to assisting the Indians to self-support. Therefore one of the purposes of the reservation of the fisheries was to assist these Indians to become self-supporting by establishing a cannery thereon. It was a practical method of assisting these Indians in view of the executive department. This proclamation was promulgated on April 28, 1916, some two months after Ordinance No. 8 of the Metlakahtlan council was adopted, praying the Secretary of the Interior to lease the cannery as the agent of the islanders. Presumably, when the proclamation was issued, the President of the United States had considered the ordinance, and a definite plan had been adopted by the executive whereby the cannery could be advantageously leased, as a practical method of assisting the islanders. Before the lease was consummated, the then existing cannery was burned, and not until a year later, in April, 1917, was the present lease executed. But in April, 1917, the nation was entering into the World War, and the whole power and energy of the government was centered in preparation for the gigantic task before it. At this critical period it would be unlikely that Congress would appropriate funds from the national treasury even for the practical purpose of erecting a cannery for the purpose of assisting these people; nor could the Secretary of the Interior, from the general appropriations for Indians, devote a portion to that specific purpose without the authority of Congress. What, then, would be more practical than to execute a lease of the building site for a cannery, providing therein for the construction and installation of the machinery of the cannery. This lease contained so many covenants advantageous to the Indian inhabitants of the islands that its practical assistance to the Indians

cannot be denied. The cannery is contracted to be erected and machinery installed; a 'fund created for the benefit of the Indians according to the number of fish canned; the fish caught by the Indians are to be purchased from them; the Indian help, as far as possible, is to be employed; the natives are to have the use of the machine shop; the co-operative store belonging to the islanders is to be patronized, the product of their sawmill is to be purchased; and finally, at the expiration of the lease, they are to have the privilege of taking over the cannery at its then true value, to be determined by arbitration. As was said by Judge Morrow, if the government is a practical affair, for practical men, what could be a more practical method of carrying out the purpose of the act of March 3, 1891, or the purpose of the President, and the expressed means of carrying that purpose into effect, as set forth in his proclamation, to assist these Indians to self-support, than by establishing a cannery on Annette Island? Section 723, Compiled Statutes U. S., provides that the President may prescribe such regulations as he may see fit for carrying into effect the various provisions of any act relating to Indian affairs. The affairs of the Metlakahtlans, residing on the reserve, are Indian affairs. This must be admitted. Counsel for the territory ably argues that, because of the affairs being Indian affairs, the Commissioner of Indian Affairs has sole jurisdiction to enter into a lease on behalf of the Indians. If the President had authority to make regulations to carry into effect the provisions of any act relating to Indian affairs, he then had authority to make regulations to carry into effect the act of March 3, 1891. The President acts through his executive officer, and presumably the rules and regulations issued for the government of the Metlakahtlans and associate natives on the Island by the Secretary of the Interior, who had supervision of Indian affairs, were issued under the authority, or at least the assent, of the President, and were lawfully promulgated under the authority of the President to make such regulations as he may see fit to carry into effect the various provisions of any act of Congress relating to Indian affairs. And such regulations would be valid, even were there no authority granted the Secretary by the act of March 3, 1891. In my opinion, even if the plaintiff were in a position to raise the question in this case, there can be no question of

the authority of the Secretary as the authorized agent of the residents of the Annette Island reserve, as well as under his general statutory authority, to enter into the lease as set forth in the agreed statement of facts.

Some criticism is made in the brief of counsel for the territory because of the fact that the Commissioner of Indian Affairs has not participated in the activities of the government in behalf of the aboriginal inhabitants of Alaska, and particularly the authority of the Secretary of the Interior is challenged to execute the lease because Congress has invested the Commissioner of Indian Affairs, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, with the management of all Indian affairs and of all matters arising out of Indian relations.

The general criticism as to the management of Indian affairs, while not pertinent to the issues in this case, may best be answered by reference to the attitude of Congress generally toward the Indians and Eskimos of Alaska. In the continental United States generally the management of the Indian affairs and reservations have been for a long period of years committed to the Bureau of Indian Affairs, under the direction of the Secretary of the Interior. Appropriations are made to and disbursed through that bureau. But Congress has seen fit to place Alaskan natives under the direction and control of the Secretary of the Interior by special provisions of statute. Section 3607, U. S. Compiled Statutes (section 7, 33 Stat. 619), provides that the education of the Eskimo and Indians in the district of Alaska shall remain under the direction and control of the Secretary of the Interior, and schools for and among the Eskimos and Indians of Alaska shall be provided for by an annual appropriation, and the Eskimo and Indian children of Alaska shall have the same right to be admitted to any Indian boarding school as the Indian children in the states and territories of the United States. The education of the natives of Alaska was by the Secretary confided to the Bureau of Education, and naturally other activities on behalf of these people were confided to that bureau, both by Congress and the Secretary, as being the bureau most conversant with their needs, as, for instance, the reindeer industry. The Bureau of Indian Affairs and that of Education,

both being bureaus under the direction and control of the Secretary, the act of the Secretary in so doing was a perfectly legitimate exercise of his general power of control of Indian affairs and his special power of direction and control under the statute aforesaid.

In United States v. De la Maza Arredondo, 6 Pet. 691, 728 (8 L. Ed. 547), the Supreme Court said:

"It is a universal principle that, where power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter; and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion, within the authority and power conferred."

As to the objection raised to the lease on the ground that it should have been executed by the Commissioner of Indian Affairs because Congress had vested in him direct management of Indian affairs, it may be said that a lease executed by a subordinate officer, under the direction of his superior, would be of no greater validity than one executed by the superior officer, having directory authority and control over his subordinate in relation to the subject-matter of the instrument.

We now turn to the further question as to whether the lease was an instrumentality of the government, and, as such, exempt from taxation by the territory. It must be conceded that, if the lease to the Annette Island Packing Company is a valid lease, and it was made and entered into on behalf of the residents of Annette Island for the purpose, on the part of the government, of carrying out its general policy for the well-being of the people of the reserve, it is an instrumentality of the government for the purposes intended.

It is to me clear that the lease of the cannery was an instrumentality of the government for the public purpose of assisting the Metlakahtlans to become self-supporting. It was recognized as such by the President of the United States. That it was a lawful instrumentality I am convinced from what I have said before. The inhabitants of the island petitioned that a lease be executed. The executive department, having control over the reserved area and direction and control over its people under the law, executed the lease for the purpose of assisting that people and to carry out its obligation

and duty to them as a dependent community. It then becomes an instrument for carrying out the purpose of Congress, set forth in the decision of our appellate court, as expressed in the Alaska Fisheries Case.

There then remains the sole question: Can the tax be levied on that instrumentality? The organic act of the territory (37 Stat. 512–518), is very broad in conferring taxing power upon the territory of Alaska. Authority is therein given to impose license and income taxes as well as ad valorem taxes, or taxes on property. In section 9 of the act there are several limitations on such power, two of which only are material in this case, viz. that no law shall be passed interfering with the primary disposal of the soil, and no tax shall be imposed upon property of the United States. No question is, or can be, raised as to the authority of the territory to impose taxes in the way of license or excise taxes upon corporations or individuals generally in the territory, but the question fairly presented in this case is whether or not the tax is upon an instrumentality of the United States or property of the United States, and, if so, whether it is void. On this question we may accept as settled the proposition so concisely set forth in the case of United States v. Bean, 253 Fed. 4, 165 C. C. A. 24, by Judge Sanborn.

It is "the universal rule that every instrumentality lawfully employed by the United States to execute its constitutional laws and to exercise its lawful governmental authority is necessarily exempt from state taxation or interference."

But the counsel for the territory insists, under authority of Talbott v. Silver Bow Co., 139 U. S. 438, 11 Sup. Ct. 594, 35 L. Ed. 210, that the taxing power of the territory is absolute, except as restricted by Congress and the Constitution of the United States. He further contends that there are no statutory limitations on such power, except as contained in section 9 of the organic act, and that the only limitation applicable to the present case is that no tax shall be imposed upon property of the United States, and that, as this is not a tax on property, it leaves the power to impose a license tax unimpaired, and that the fact that the packing company is or was an instrumentality of the government is no defense.

The argument of counsel herein begs the true question at issue. The case of Talbott v. Silver Bow Co., 139 U. S. 438,

11 Sup. Ct. 594, 35 L. Ed. 210, arose upon the right of the
territory to tax national banks, under the National Banking
Act, which authorized the states of the Union to impose a
tax, but did not give the territory that authority. The court
held that the territory had the power, for the reason that the
National Banking Act was national in design, intended to be
a banking system for the nation, including the territories of
the United States as well as the states, and that the word
"states," as used in the act, should be taken in its larger mean-
ing, that is to say, "a political community"; that the power
of taxation in the territory, under the general territorial sys-
tem, was absolute, except as restricted by the Constitution
and congressional enactments.

Counsel for the territory draws from this decision the in-
ference that the power vested in the territory is more abso-
lute than that of the states. This inference is not warranted
by the decision. The extent of the power of taxation of states
is absolute, save as restricted by the Constitution of the Unit-
ed States; that is to say, that states have no power, by taxa-
tion or otherwise, "to retard, impede, burden, or in any man-
ner control the operations of the constitutional laws enacted
by Congress to carry into execution the powers vested in the
general government." McCulloch v. Maryland, 4 Wheat. 436,
4 L. Ed. 579. This is the final conclusion of the masterly
opinion of Chief Justice Marshall, and has been reiterated
by all the courts of the United States for more than a cen-
tury, and applies equally to the power of taxation of the ter-
ritories of the United States, as well as of the several states.

The contention of counsel that the power to tax the Annette
Packing Company, although an instrumentality of the gov-
ernment, is absolute, is not sustained by the case of Talbott
v. Silver Bow Co. In that case it was held that the power
of the territory to tax is equal to that of the states where there
is no provision to the contrary by congressional enactment.
If the tax levied by the territory was an ad valorem tax
against the personal property, the question would be a dif-
ferent one than that before us in the present case. In Mc-
Culloch v. Maryland the doctrine that a state may tax pri-
vate property, although belonging to an agent of the govern-
ment, is upheld, and under this principle the several cases
involving the right of taxation of the Union Pacific Railway

were decided. In Central Pacific Railway Co. v. California, 162 U. S. 91, 16 Sup. Ct. 766, 40 L. Ed. 903, Chief Justice Fuller said:

"It cannot be that a state tax [meaning a property tax] which remotely affects the efficient exercise of a federal power is for that reason alone inhibited by the Constitution."

In Thomas v. Gay, 169 U. S. 264, 18 Sup. Ct. 340, 42 L. Ed. 740, which was a case wherein the Secretary of the Interior had leased to cattlemen lands on an Indian reserve, and the territory of Oklahoma sought to tax the cattle and the cattlemen resisted the tax on the ground that it was an invasion of the jurisdiction of the United States. The court therein held that the act of the Legislature of Oklahoma which provided "that when any cattle are kept or grazed or any other personal property is situated in any unorganized coun-, try, district or reservation of this territory, such property shall be subject to taxation in the organized county to which said country, district or reservation is attached for judicial purposes," was a legitimate exercise of the territory's power of taxation, and in regard to the taxation of cattle belonging to persons not residents of the territory, grazing upon Indian lands, that its enforcement did not violate the Constitution of the United States. The decision was rendered by Justice Shiras, and in his opinion he says:

"But it is urged that the Indians are directly and vitally interested in the property sought to be taxed, and that their rights of property and person are seriously affected by the legislation complained of; that the money contracted to be paid for the privilege of grazing is paid to the Indians as a tribe, and is used and expended by them for their own purposes, and that if, by reason of this taxation, the conditions existing at the time the leases were executed were changed, or could be changed by the Legislature of Oklahoma at its pleasure, the value of the lands for such purposes would fluctuate or be destroyed altogether according to such conditions.

"But it is obvious that a tax put upon the cattle of the lessees is too remote and indirect to be deemed a tax upon the lands or privileges of the Indians. * * *

"The suggestion that such a tax on the cattle constitutes a tax on the lands within the reasoning in the case of Pollock v. Farmers' Loan & Trust Company, 157 U. S. 429, is purely fanciful. The holding there was that a tax on rents derived from lands was substantially a tax on the lands. To make the present case a sim-

ilar one the tax should have been levied on the rents received by the Indians, and not on the cattle belonging to third parties. * * *

"The unlimited power of Congress to deal with the Indians, their property and commercial transactions, so long as they keep up their tribal organizations, may be conceded; but it is not perceived that local taxation, by a state or territory, of property of others than Indians, would be an interference with congressional power. It was decided in Utah & Northern Railway v. Fisher, 116 U. S. 28, that the lands and railroad of a railway company within the limits of the Ft. Hill Indian Reservation in the territory of Idaho were lawfully subject to territorial taxation, which might be enforced within the exterior boundaries of the reservation by proper process. The question was similarly decided in Maricopa & Phoenix Railroad v. Arizona Territory, 156 U. S. 347.

"The taxes in question here were not imposed on the business of grazing, or on the rents received by the Indians, but on the cattle as property of the lessees, and as we have heretofore said that such a tax is too remote and indirect to be deemed a tax or burden on interstate commerce, so is it too remote and indirect to be regarded as an interference with the legislative power of Congress."

It may be well conceded, then, that a tax on private property of a corporation or of an individual not a member of the tribe situated within the limits of the reservation may be levied by the territory, provided the tax be an ad valorem tax on property. And, if the tax sought herein to be enforced was such ad valorem tax on private property of the Annette Island Packing Company, it would be enforceable; but the taxes provided for by the act of the territorial Legislature are occupational or privilege taxes, and a different rule applies as to these taxes. In Thomson v. Union Pacific Railway, 9 Wall. 579, 591, 19 L. Ed. 792, Mr. Chief Justice Chase, delivering the opinion of the court, says:

"We think there is a clear distinction between the means employed by the government and the property of agents employed by the government. Taxation of the agency is taxation of the means; taxation of the property of the agent is not always, or generally, taxation of the means."

Privilege or occupational taxes are entirely different from property taxes, both in their character and function. A property tax is based upon the value of property, the situs of which is within the jurisdiction of the taxing power. Its purpose is to raise revenue, and, when collected, that purpose is served. The power to raise revenue by a property tax is inherent in the government as a necessary incident thereof. An occupa-

.tion or privilege tax is a license to regulate a given business or control the right to engage therein. It is imposed upon the right or privilege of engaging in business. As has been stated, its primary purpose is to regulate the conduct of the business designated, and it derives its source from the police power vested in the state of regulation. Both kinds of taxes may be levied and collected at the same time, and both would be valid.

That the taxes imposed by the act of the territorial Legislature are license taxes must be admitted. The territory concedes it. The Circuit Court of Appeals has decisively and unequivocally decided that question in the Alaska Fisheries Case, and the United States Supreme Court has also decided the same in Alaska Fish Co. v. Smith, 255 U. S. 50, 41 Sup. Ct. 219, 65 L. Ed. 489. The act of the Legislature of 1919 levying this tax provides in section 1: '

"That any person, firm or corporation prosecuting, or attempting to prosecute, any of the following lines of business in the territory of Alaska shall apply for and obtain a license, and pay for said license, for the respective lines of business, as follows."

Then follow the several lines of business. The language of section 1 shows that it is not an ad valorem tax on property, but a license tax on the privilege of engaging in the lines of business enumerated in the act.

From the time of the rendition of the opinion in McCulloch v. Maryland down through the course of a century of judicial decisions the distinction therein noted between the two classes of taxes as affecting an agency of the government, whether state or federal, has been adhered to. If the tax is on the property of the agent of a government, it may be, but generally is not, a burden imposed on an instrumentality of the government. It depends in that case whether or not it is a direct interference with governmental affairs. But a tax in the nature of a license or occupational tax on an agent or instrumentality of the government is a tax directly imposed on the right of that agent or instrumentality to perform the duties imposed on it by the government and resolves itself into the right to regulate, control, or destroy governmental activities; for, as said by Chief Justice Marshall, the right to tax is the right to destroy.

In the Case of Alaska Salt Fish Co. v. Smith, 255 U. S. 44, 41 Sup. Ct. 219, 65 L. Ed. 489, the question of the territory to impose a license tax which would destroy the industry was raised, and the Supreme Court held that it was within the lawful authority of the territory under its power of regulation to impose such a tax, even though confiscatory.

But, whether the tax be large or small, the principle is the same; the tax is a direct tax on the privilege of pursuing the occupation and becomes a burden directly imposed thereon, and is clearly to be differentiated from an ad valorem tax imposed on the property which may be owned by the person pursuing the occupation.

Conceding that the salmon cannery established on Annette Island is a lawful instrumentality of the government for the public purpose of assisting the Metlakahtlans and associate natives on the island, the territory is under the Constitution, as interpreted in McCulloch v. Maryland and a long series of cases, prohibited from burdening, impeding, or interfering with that instrumentality by a direct tax thereon.

The position of the territory seems to be that a tax of three to five cents per case on salmon canned and the other taxes, will be no burden on an instrumentality of the government or interfere with or impede the activities thereof. As stated before, it is not the amount of the tax which should guide us; it is the principle involved. If the territory can impose a tax of one cent legally, it can lawfully impose a tax of $10 per case under the guise of regulation. The practical effect of allowing this tax would be that the power of taxation vested in the territory would be superior to and render nugatory constitutional laws enacted by Congress to carry out the duties and obligations of the government. These observations are in accord with the decisions of the Supreme Court as exemplified in the following cases:

The case of Thomson v. Railroad Co., 9 Wall. 579, 19 L. Ed. 792, arose on the right of the state of Kansas to tax certain property of the Union Pacific Railroad, Eastern Division. The railroad company was a Kansas corporation, and had been subsidized and received a land grant from Congress, and in consideration therefor undertook to perform certain duties for the government. Congress had not exempted the railroad property from taxation. It was held by the Supreme Court,

in effect, that the property of a state corporation does not by the mere fact of the corporation's employment as a federal agency become exempt from taxation. It will be noted that the tax was an ad valorem tax on property of the agent, and not a privilege or franchise tax on the agent.

In the case of Railroad Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787, which arose on the authority of the state of Nebraska to tax the real and personal property of the railroad company, the railroad company had received a land grant and subsidy and was incorporated avowedly to provide military and postal facilities for the government. To that extent it was a federal agency, and immunity from taxation of its real and personal property was sought on that ground. The Supreme Court held that the test of exemption was whether the tax impeded the federal agency in its federal operation, that a tax on the property of a federal agent which it bore in common with other persons and property did not so impede it, but that a tax on the operations of a federal agent does impede it and would be void, it being specifically pointed out that the taxes declared void in McCulloch v. Maryland and Osborne v. Bank of United States, 9 Wheat. 738, 6 L. Ed. 204, were taxes on the operations of the federal agency.

In Western Union Tel. Co. v. Texas, 105 U. S. 460, 26 L. Ed. 1067, the telegraph company had received from the government the privilege of using the post roads and rights of way over public lands, and in return bound itself to carry government messages. The state sought to impose a tax on each message, including those of the government. The tax on the government messages was held void as a tax on a federal agency. The tax was on the operations of the agency in government service and tended directly to impede their operations.

In the case of California v. Central Pacific Railroad, 127 U. S. 1, 8 Sup. Ct. 1073, 32 L. Ed. 150, wherein the state sought to tax the property of the railroad and its franchise, the franchise to construct and operate the railroad was granted by the government, and the railroad assumed in turn the obligation to transport the mails and troops of the government.

It was held that, while the state might tax the tangible property of the railroad company, it could not tax those of its franchise derived from the federal government, the theory of

6 A.R.—40

the decision seeming to have been that the railroad company was not a federal agency by reason of any service it rendered, but that it enjoyed a privilege from the federal government which the state could not by taxation impair.  The same fundamental principle, however, is involved as in the other cases.

In Farmers' Bank v. Minnesota, 232 U. S. 516, 521, 34 Sup. Ct. 354, 355 (58 L. Ed. 706), Mr. Justice Pitney, for the court, in discussing the validity of a tax imposed upon the surplus of a savings bank of which bonds issued by municipalities of Indian Territory and Oklahoma were a part, says:

"It was laid down by Mr. Chief Justice Marshall, speaking for this court in McCulloch v. Maryland, 4 Wheat. 316, 430, 436, that the state could not constitutionally impose taxation· upon the operations of a local branch of the United States Bank, because the bank was an agency of the federal government, and the states had no power, by taxation or otherwise, to hamper the execution by that government of the powers conferred upon it by the people. The supremacy of the federal Constitution and the laws made in pursuance thereof, and the entire independence of the general government from any control by the respective states, were the fundamental grounds of the decision.  The principle has never since been departed from, and has often been reasserted and applied. * * * Chief Justice Marshall said, in closing the discussion:  'This opinion * * * does not extend to a tax paid by the real property of the bank, in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the state.  But this is a tax on the operations of the bank, and is, consequently, a tax on the operations of an instrument employed by the government of the Union to carry its power into execution.  Such a tax must be unconstitutional.' "

In the case of Choctaw, O. & Gulf R. Co. v. Harrison, 235 U. S. 292, 296, 35 Sup. Ct. 27, 28 (59 L. Ed. 234), the court, in discussing the gross production tax on leases of coal mines on the Choctaw and Chickasaw lands within the reservation says:

"In harmony with the provisions of the Curtis Act, appellants secured from the duly appointed trustees leases of certain mines" on the reservation, "obligating itself to take out annually specified amounts of coal, and to pay the stipulated royalty.  It proceeded actively to develop these, either directly or through its agent, and for some years before the present suit was begun took therefrom large quantities of coal and fully complied with the obligations assumed.

"Section 6 of the Oklahoma statute * * * provides: 'Every * * * corporation engaged in the mining, or production, within this state, of coal, * * * shall * * * file * * * a statement * * * showing the location of each mine * * * operated by [it] during the last preceding quarter, * * * the kind of mineral; * * * the gross amount thereof produced; the actual cash value thereof; * * * and shall, at the same time, pay to the state treasurer a gross revenue tax, which shall be in addition to the taxes levied, and collected upon an ad valorem basis upon such mining * * * property and appurtenances thereunto belonging, equal to two per cent. of the gross receipts from the total production of coal.' "

The court then said:

"From the foregoing it seems manifest that the agreement with the Indians imposed upon the United States a definite duty in respect to opening and operating the coal mines upon their lands, and appellant is the instrumentality through which this obligation is being carried into effect. Such an agency cannot be subjected to an occupation or privilege tax by a state"—citing McCulloch v. Maryland, 4 Wheat. 435, 4 L. Ed. 579; Farmers' Bank v. Minnesota, 232 U. S. 516, 34 Sup. Ct. 354, 58 L. Ed. 706.

The court further says:

"The requirement [speaking of the statute] is not on account of property owned on a given day, as is the general custom where ad valorem taxes are provided for and as the Oklahoma laws require; but the manifest purpose is to reach all sales and secure a certain percentage thereof—a method commonly pursued in respect of license and occupation taxes. * * * A tax upon a merchant's, manufacturer's, or miner's gross sales is not the same thing as one on his stock treated as property. * * * The former is upon his business. * * * We think it cannot lawfully be subjected thereto."

As will be seen, in this case the state of Oklahoma attempted to tax the railroad under a law requiring every person engaged in mining coal to make a report of the cash value of the product and pay a gross revenue tax or occupational or privilege tax of two per cent. on the gross receipts, in addition to the tax levied upon an ad valorem basis, and the court held that such a tax would not be levied upon the output of coal mines on the Indian lands.

In the case of Indian Territory Oil Co. v. Oklahoma, 240 U. S. 522, 36 Sup. Ct. 453, 60 L. Ed. 779, it was held by the Supreme Court that a tax upon a lease was a tax upon the

power to make the lease, and that the oil leases made by the Osage Indians, under the authority of Congress, was a federal instrumentality, and the state could not therefore tax his interest directly or indirectly, as though the leases were represented by the capital stock of the corporation owning them. The Supreme Court of Oklahoma rendered two opinions in the case, in the first holding that the leases were taxable, and on rehearing decided that they could not be so held, but gave them effective representation in the capital stock of the company, and the latter was then taken as evidence of the value of the property of the company as a basis of an ad valorem tax. The Supreme Court of the United States, in reversing the opinion of the Oklahoma court, said:

"Whether the Constitution of the state permits this accommodation we are not called upon to say. We are clear it cannot be permitted to relieve from the restraints upon the power of the state to tax property under the protection of the federal government. That the leases have the immunity of such protection we have decided."

In the case of Gillespie v. State of Oklahoma (Jan. 30, 1922), 257 U. S. 501, 42 Sup. Ct. 171, 66 L. Ed. 338, Mr. Justice Holmes, for the court, reviewed again the question of taxation of leases upon Indian lands in the state of Oklahoma and again reversed the decision of the Supreme Court of Oklahoma, reported in 81 Okl. 103, 197 Pac. 508. This last case arose under a statute of the state making every person liable to a tax on his entire net income from all sources except such as were exempt under the laws of the United States or the state itself. The state sought, under this statute, to hold plaintiff in error liable for taxes upon the net income derived as lessee from leases of reserved Indian lands. The defendant, the plaintiff in error, in accordance with the statute, made a return as required, but claimed exemption from the tax under the Constitution and laws of the United States. The auditor of the state accepted the return, but held defendant liable for taxes on his income, derived by him from sales of oil and gas received under his leases of Indian lands. This is the identical contention which is made by the territory in the instant case in the third cause of action of its complaint and upon approximately the same facts. It was agreed that the lessee was an instrumentality used by the United States in carrying

out duties to the Indians that it had assumed, and, as the Supreme Court said, the only question in the case is whether he was liable to this kind of tax.

The court then adverted to the case of Choctaw, Oklahoma & Gulf R. Co. v. Harrison, which was to the effect that the lessee could not be taxed on the gross sales of coals from Choctaw and Chickasaw mines in addition to an ad valorem tax. The court also referred to the case of Indian Territory Oil Co. v. Oklahoma to the effect that similarly a lessee could not be taxed on the value of an Osage oil lease, and also to the cases of Howard v. Gipsy Oil Co., 247 U. S. 503, 38 Sup. Ct. 426, 62 L. Ed. 1239, and Large Oil Co. v. Howard, 248 U. S. 549, 39 Sup. Ct. 183, 63 L. Ed. 416, which were per curiam decisions. The court said, in reference to these last two cases, that, in deciding them, it applied the same principles to them as to gross production taxes without reference to the fact that the taxes, instead of being in addition to, were in lieu of all taxes upon property rights. The court then considers the cases of Howard v. Gipsy Oil Co. and Large Oil Co. v. Howard, and reaffirms them as correct. Then, after pointing out the distinction between the decisions in the cases of Indian Territory Oil Co. v. Oklahoma, Howard v. Gipsy Oil Co., and Large Oil Co. v. Howard, and certain cases sustaining taxes on incomes derived from interstate commerce, it says:

"The rule as to the instrumentalities of United States, on the other hand, is absolute in form and at least stricter in substance. * * * 'A tax upon leases is a tax upon the power to make them, and could be used to destroy the power to make them.' * * * The step from this to the invalidity of the tax upon income from the leases is not long. * * *

"In cases where the principal is absolutely immune from interference an inquiry is allowed into the sources from which net income is derived and if a part of it comes from such a source the tax is pro tanto void. * * * Whether this property could be taxed in any other form or not, it cannot be reached as profits or income from leases such as those before us. The same considerations that invalidate a tax upon the leases invalidate a tax upon the profits of the leases, and, stopping short of theoretical possibilities, a tax upon such profits is a direct hamper upon the effort of the United States to make the best terms that it can for its wards. * * * The taxation of cattle grazing on Indian lands held valid in Thomas v. Gay, 169 U. S. 264, obviously is more remote."

In my view, this decision of the Supreme Court is decisive of the question as to the validity of the tax claimed on the income of the lessee, derived entirely from its operations as lessee on the Annette Island reserve. It, the lease, was an instrumentality of the government for the purpose of carrying out the obligation of the government to the inhabitants of the island. It is a direct tax upon the net income derived from such lease, and is therefore void under the decision of the Supreme Court in the case of Gillespie v. State of Oklahoma.

As to the license tax on traps of defendant, the case of Alaska Fisheries Co. v. Territory is decisive of the question that it is not a property tax, but is a privilege or license tax on the business of fishing. The court in the foregoing case took up the contentions of the fisheries company that the tax is a property tax, and, in lucid, cogent reasoning, disposes of the question in the following language:

"It is argued that the Legislature * * * did not have reference to the business of fishing with fish traps, as 'dummy traps' are classed with others, and, as dummy traps cannot be used in fishing, it is said the Legislature intended to place a specific property tax on fish traps regardless of whether the traps were used in catching fish or not. Pursuing this line of thought, plaintiff in error argues that the character of the tax, from a tax on a fish trap as property to a tax on the business of fishing by means of fish traps merely limits the persons liable to pay a tax on fish traps to those engaged in fishing by means of such traps, and that the tax is not free from being objectionable as a specific property tax on fish traps rather than a tax on the business of fishing with the traps.

"If this construction of the territorial statute is the correct one, then it may be that the tax is not one on the business of fishing, but is upon the property used in such business. We are of opinion, however, that the broad rule of construction by which we are to ascertain the true intent of the Legislature does not allow this meaning to prevail. The act * * * by section 1 provides that any person 'prosecuting, or attempting to prosecute any of the following lines of business * * * shall apply for * * * a license * * * for the respective lines of business as follows: * * * Fish Traps: Fixed or floating, $100 per annum. So-called dummy traps included.' * * *

"To 'prosecute a designated line of business' means, in ordinary acceptation, to carry on the kind of business designated. Carrying on the 'line of business' of fish traps in Alaska, by common or popular understanding of persons who are at all conversant with fishing in Alaska, is understood to be fishing with fish traps. Hence

the words should be given their ordinary meaning as used in connection with the business of fishing in Alaska."

The tax, therefore, is in the nature of a license tax on the business of fishing, imposed upon an instrumentality of the government, and comes within the decision of the Supreme Court in the Gillespie Case, and is void for that reason.

But there is a further reason. The right of fisheries on the reservation and adjacent waters is reserved for the benefit of the Indians resident thereon, and, by taxing traps on the reservation, the territory assumes the right to license the privilege of carrying on the business of fishing with traps on a reserved area over which it has no jurisdiction. This it cannot do.

As to the tax based on the number and kind of salmon canned, it is a license tax based upon the gross production of the canneries and comes within the scope of the decisions in Howard v. Gipsy Oil Co. and Large Oil Co. v. Howard, supra.

I herein have not considered the effect of paragraph 21 of the lease, providing that, if the packing company is not compelled to pay the territorial tax, the amount that might be assessed by the territorial law shall be paid for the use of the inhabitants. I do not deem that clause material to a decision in the case. Holding, as I do, that the Annette Islanders are wards of the government, and that the Secretary of the Interior was authorized by law to enter into the lease with the packing company, it follows that the packing company became an instrumentality of the United States for carrying out its policy for the protection and well-being of its wards, and that the taxes sought to be enforced, being license taxes on the privilege of such instrumentality of carrying on its business, are a direct tax on that instrumentality, and therefore void. For this reason, I do not deem it necessary to enter into the question of the direct pecuniary advantage to the wards of the government arising from the invalidity of the tax.

A question as to the right of the Secretary of the Interior to intervene in this case has been raised by counsel for the territory. This question was argued on demurrer to the complaint in intervention at the outset of the case, and the demurrer was overruled by the judge then sitting. Personally, I feel disinclined to take up the question again. Under my

theory of the case, if any intervention were necessary, such steps should have been taken by the United States, which had a direct interest as guardian of a dependent people. See U. S. v. Winans [C. C.] 73 Fed. 72, and section 4102, U. S. Compiled Statutes.

"Under the general rule, where an officer of the United States is acting in line of his duty and by legal authority, his contracts, made on account of the government, are public, and not personal, and the United States may, on its own behalf, intervene in the courts to carry out the provisions of such contracts."

But the theory adopted in the inception of the case seems to have been that the Secretary of the Interior, under the authority of Ordinance No. 8, was the agent of the Annette Islanders, and as such had authority to intervene as trustee of an express trust and as being the person with whom and in whose name the lease was made for the benefit of such islanders.

Counsel for the territory contends that the Secretary of the Interior has no such direct and immediate interest in the action by which he may either gain or lose by the direct legal operation and effect of the judgment as would permit him to intervene, and cites as authority for his contention the case of Smith v. Gale, 144 U. S. 518, 12 Sup. Ct. 674, 36 L. Ed. 521, and that therefore the demurrer should have been sustained. The rule laid down by counsel is the correct rule as to intervention, but, if I am right as to the theory of intervener's counsel as to parties, it must follow that the intervener, as trustee of an express trust, has a direct interest in the result of the action. If the defendant is an instrumentality for the performance of intervener's obligation to his cestui que trust, and the result of the action would be to impose additional burden on that instrumentality, it would be a direct burden on the discharge of intervener's trust and a burden directly arising from the legal operation of the judgment.

Whether my conclusions as to the basis of intervention is correct or not makes little difference, as it does not affect the real merits of the action, for the reason that the agreed statement of facts which are admitted by counsel on all sides must be taken as facts in the case submitted to the court without objection.

Under the agreed statement of facts and the law, as I have found it, judgment should be entered of dismissal of the action with prejudice.

Let findings and judgment be prepared in accordance herewith.

⊂⟩See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes